# United States District Court

## SOUTHERN DISTRICT OF INDIANA

**UNITED STATES OF AMERICA**

v.

**FRANKLIN V. FENNELL, and**
**FRANK SHAHADEY**

-01
-02

**CRIMINAL COMPLAINT**

CASE NUMBER: 2:16-mj-00032

# SEALED

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  Between or about April, 2014 and October 28, 2016, in Vigo County, in the Southern District of Indiana defendants did,

Count 1:   Theft or Bribery Concerning Programs Receiving Federal Funds, in violation of Title 18, United States Code, Section 666.

I further state that I am a Special Agent, and that this complaint is based on the following facts:

See attached AFFIDAVIT

**Continued on the attached sheet and made a part hereof.**

_____
Joann Dowell, Special Agent, FBI

**Sworn to before me, and subscribed in my presence**

November 1, 2016
**Date**

at   Indianapolis, Indiana
_____

_____
Mark J. Dinsmore, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

**UNDER SEAL**

## AFFIDAVIT

This affiant, Joann Dowell, Special Agent, U.S. Department of Justice, Federal Bureau of Investigation, being duly sworn under oath, states as follows:

1.      I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been employed with the FBI since 1999. I am currently assigned to the Indianapolis Division, Terre Haute Resident Agency. While employed by the FBI, I have investigated a variety of federal criminal violations to include public corruption, white collar crimes, violent crimes, child exploitation, child pornography, and prison crimes. I have gained experience in conducting criminal investigations through FBI training, FBI continuing education, and through experience of daily work assignments.

2.      I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.      In connection with my official FBI duties, I investigate criminal violations of federal law including, Title 18, United States Code, Section 666 (Theft or bribery concerning programs receiving Federal funds); Title 18, United States Code, Section 1341 (Mail fraud); Title 18, United States Code, Section 1343 (Wire fraud); and Title 18, United States Code, Section 371 (Conspiracy to commit the foregoing offenses).

1

**UNDER SEAL**

4.     I make this affidavit in support of arrest warrants for FRANKLIN V. FENNELL ("FENNELL"), date of birth XX/XX/1968, and FRANK SHAHADEY ("SHAHADEY"), date of birth XX/XX/1956, for violations of Theft of Programs Receiving Federal Funds in violation of Title 18, United States Code, Section 666.

5.     This affidavit is made in support of a one-count criminal complaint charging that:

   a.     Between or about April 2014, and October 28, 2016, FRANKLIN V. FENNELL and FRANK SHAHADEY, while working for the Vigo County School Corporation, in Vigo County, Indiana, which is within the Southern District of Indiana, embezzled, stole, obtained by fraud, or otherwise converted to the use of individuals other than the Vigo County School Corporation, more than $5,000 in funds owned by, or in the care, custody, and control of the Vigo County School Corporation, a State or local government agency, that receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance, or other form of Federal assistance.

6.     The information contained in this affidavit is either personally known by me, or told to me by other federal officers, state and local law enforcement officers, and/or other related to this investigation. Sufficient facts to establish probable cause are included in this affidavit and not all known facts of the investigation are included

2

**UNDER SEAL**

because they may be deemed irrelevant, redundant, or not necessary to support probable cause.

## BACKGROUND

7.      On or about February 3, 2016, representatives from the Indiana State Board of Accounts (SBOA) received a tip about corruption at the Vigo County School Corporation (hereinafter "VCSC") and its Superintendent, Danny Tanoos (hereinafter "Tanoos"). According to the tipster, the VCSC awarded contracts to vendors only after those vendors provided kickbacks to the school or its employees.

8.      Pursuant to the National Center for Education Statistics, the primary federal entity for collecting and analyzing data related to education in the U.S. and other nations, the VCSC received more than $14 million in federal funds for the 2014-2015 school year. (This is the most recent year these numbers are available.) Pursuant to the Annual Financial Report filed by the VCSC with the Indiana State Board of Accounts, the VCSC received more than $12 million from the U.S. Department of Education for the 2015-2016 school year.

9.      FENNELL is presently the Facilities Director for the VCSC. As part of his duties as the Facilities Director for VCSC, FENNELL is responsible for the proper maintenance and servicing of all VCSC locations and facilities; to include the schools. In carrying out his duties, FENNELL routinely submits, or causes to be submitted, requisitions to the VCSC Business Office, which in turn, creates Purchase Orders ("P.O.") which are sent to selected vendors authorizing the vendor to complete work.

3

**UNDER SEAL**

After the work is complete, the Business Office uses VCSC funds to pay the vendor for services/supplies rendered.

10.     SHAHADEY is presently a sworn deputy with the Vigo County Sheriff's Department who is assigned to the VCSC and is listed on the VCSC website under School Security.

11.     Business A, owned by Individual A, is a current vendor for the VCSC. Business A performs numerous duties for the VCSC; to include tree trimming and tree and stump removal.

12.     While investigating violations of Title 18, United States Code, Section 666 (Theft or bribery concerning programs receiving Federal funds); Title 18, United States Code, Section 1341 (Mail fraud); Title 18, United States Code, Section 1343 (Wire fraud); and Title 18, United States Code, Section 371 (Conspiracy to commit the foregoing offenses), the Federal Bureau of Investigation ("FBI") executed federal search warrants on multiple VCSC locations on June 8, 2016.

13.     Concurrent with the execution of the federal search warrants, agents conducted interviews and served numerous subpoenas.

14.     As part of that investigation, agents interviewed FENNELL and Individual A.

**FENNELL'S JUNE 8, 2016 INTERVIEW**

15.     On or about June 8, 2016, agents interviewed FENNELL. During that interview, FENNELL denied receiving kickbacks from Individual A or Business A. The following are excerpts from the interview:

4

**UNDER SEAL**

| | |
|---|---|
| Agent: | Has [Business A or Individual A] ever given you anything, personally? |
| Fennel: | (long pause) Individual A has.  [He/she], [he/she] donated, uh, $500 to my daughter's, uh, we did a Go Fund Me page. |
| Agent: | Uh-huh. |
| Fennell: | And my daughter has a walker. |
| Agent: | Ok. |
| Fennell: | And so we were going to do a dog training thing and [he/she] did, uh, [he/she] donated $500 to that. |
| Agent: | Ok, has [he/she] ever donated anything else to you?  Or given you anything of value?  Tickets, food, anything else that you know of? |
| Fennell: | No. |

| | |
|---|---|
| Agent: | [Individual A's] never given you money under the table? |
| Fennell: | Nope. |

| | |
|---|---|
| Fennell: | I don't take any money from anybody for anything. |
| Agent: | Ok, that's a good statement. So you've never been paid. |
| Fennell: | (OV) No. |
| Agent: | To put a vendor on the list. |
| Fennell: | No. |
| Agent: | You've never . . . |
| Fennell: | (OV) Never. |
| Agent: | Been given gifts, whether it's cards, whether it's a brown bag of money under the table. |
| Fennell: | No. |
| Agent: | You've never received anything like that? |
| Fennell: | No. |

| | |
|---|---|
| Agent: | Who approves all [Business A] work? |
| Fennell: | I do. |
| Agent: | Ok, so you get my point is, in my mind you handle, you approve all their work, you approve all their invoices. |
| Fennell: | Uh-huh. |
| Agent: | Then on all likelihood you would know what [Business A] does. |
| Fennell: | I do. |
| Agent: | And you would know . . . |
| Fennell: | (OV) Now. |
| Agent: | If they got contracted to do a fence, to do a bridge, to do a parking lot. |
| Fennell | And I can tell you, right now, it was, uh, the specifics of why they were chosen for the fence, I don't know, I don't remember that day or what happened.  But I my, my, my sense is that hey here is ah um, here is a, uh, project, maybe they're out there doing another project or looking at a project and, and this comes up, you're walking around with the Principal, you're walking (UI) that |

5

**UNDER SEAL**

|  |  |
|---|---|
|  | way and you say, hey by the way this, this happens boom, boom bang, would you want to do this? And can you do it? Can you knock it out today?  Sure. |
| Agent: | Ok. |
| Fennell: | What's the price? I, I'm not trying to be, um, I mean there are some jobs you just . . . |
| Agent: | (OV) We just keep talking in circles here so we might as well, you know, not continue down that road. |
| Fennell: | I don't, um, I guess. Ok. |
| Agent: | Well, it is what it is, Mr. Fennell. We're going to get the records. |
| Fennell: | Right. |
| Agent: | Ok. And here's, here's some of the things that happen, these these prices that you're paying particular, certain, certain vendors are highly inflated, highly inflated and a lot of the work is not being done.  And these vendors. And I, we've talked about [Business A] the most are still getting paid for the work. And either they're sub-contacting it or not doing it at all.  And . . . |
| Fennell: | (OV) No, I'm telling you right now.  That's not true. |
| Agent: | Ok. |
| Fennell: | That's not true.  100% that's not true. |
| Agent: | (OV) We're not here for nothing. |
| Fennell: | (OV) The vendors that work, that I'm working with are doing what they're asked to do at the price that they, that they do it. |

## INDIVIDUAL A's INTERVIEW

16.    On July 8, 2016, agents interviewed Individual A.    During that interview, Individual A advised that he/she had been paying kickbacks to FENNELL and SHAHADEY for more than two years arising out of his/her work for VCSC.

17.    According to Individual A, FENNELL, SHAHADEY, and Individual A had engaged in a scheme to defraud VCSC since early 2014.  Beginning in early 2014, and continuing until or about October 2016, Individual A, at FENNELL and SHAHADEY'S direction, submitted inflated or false estimates and invoices for work at VCSC locations to FENNELL.  FENNELL then awarded the work contract on VCSC'S behalf to Business A.  When the work was completed (and in some cases, no work was completed), FENNELL submitted the inflated invoice to the VCSC

6

UNDER SEAL

Business Office. The VCSC Business Office then mailed payment taken from VCSC funds to Business A.

18.     According to Individual A, when Business A received payment from the VCSC, Individual A deposited the check, withdrew cash, and provided cash payments to FENNELL and SHAHADEY.

19.     According to records obtained from Individual A, Business A performed approximately 58 jobs for VCSC between January 2014 and June 2016. According to Individual A, there were few jobs between January 2014 and March 2016 that were awarded to Business A by the VCSC in which kickback payments were *not* made. And, when kickback payments were made, Individual A never paid less than $500 to each FENNELL and SHAHADEY.

20.     According to Individual A, there were times that no work was completed and fake invoices were submitted. In those instances, FENNELL, SHAHADEY, and Individual A split the proceeds from the payment from the VCSC.

21.     Individual A advised that in one instance, another vendor, not on the VCSC approved vendor list, completed the work. In that instance, FENNELL asked Individual A to submit an invoice so that the VCSC would fund the work. When Individual A received the payment from the VCSC, he/she gave the payment to FENNELL.

22.     During the July 8, 2016 interview, Individual A provided copies of all of Business A's estimates, invoices, purchase orders, and expenses related to VCSC work. Per Individual A's records, the VCSC paid Business A more than $440,000

UNDER SEAL

during the time period of January 2014 to June 2016.  According to Individual A, of the $440,000, only approximately $37,520 comprised payments in which no kickback payment was paid to FENNELL and SHAHADEY.  Those invoices represented, for the most part, the first few jobs completed by Business A prior to the scheme's initiation.  The remaining work almost always included kickback payments to FENNELL and SHAHADEY.

23.    According to Individual A, SHAHADEY often referred to kickback payments as a "geeb."  Additionally, Individual A told agents that he/she was in possession of a VCSC check for $33,700 for work that Business A completed prior to the execution of the June 8, 2016, search warrants.  According to Individual A, FENNELL and SHAHADEY were expecting a kickback from the $33,700 check. During the interview, Individual A further agreed to cooperate, and to assist agents by recording in-person meetings and telephone conversations with SHAHADEY.

### FENNELL'S INTERVIEW

24.    On July 12, 2016, agents again interviewed FENNELL, who was represented by counsel, and FENNELL again denied receiving valuable gifts, to include cash, from any VCSC vendor, including Business A.

### JULY 15, 2016 KICKBACK PAYMENTS TO SHAHADEY AND FENNELL

25.    On or about June 15, 2016, Individual A received a $33,700 check from the VCSC as payment for multiple jobs Business A had completed prior to the execution of the federal warrants on June 8, 2016 (referenced in paragraph 23).

**UNDER SEAL**

26.     On or about July 15, 2016, and at the direction of agents, Individual A deposited the check. Agents then provided Individual A with the necessary cash to make the previously agreed kickback payments to FENNELL and SHAHADEY.

27.     On July 15, 2016, Individual A met with SHAHADEY in a consensually recorded meeting at the VCSC Administration Building. Prior to the meeting, agents met with Individual A and searched Individual A's person and vehicle. Any currency in Individual A's possession was removed. Agents provided Individual A with $7,000. During the meeting, which was recorded, Individual A paid SHAHADEY $6,000 in cash, as directed by agents. Individual A informed SHAHADEY the money was to be split with FENNELL; each receiving $3,000. Agents observed Individual A and SHAHADEY speaking outside the Administration Building. Agents also observed Individual A and SHAHADEY enter the Administration Building during the meeting. During the recorded meeting, SHAHADEY advised that he would provide $3,000 to FENNELL as previously agreed. Excerpts from that meeting follow:

| | |
|---|---|
| Ind. A: | Yeah God help ya. Uh. If you said geebing [kickback]. Uh. |
| Shahadey: | Yeah, they don't know what that means. |
| Ind. A: | Right but – |
| Shahadey: | But you know we were pretty smart not to ever say anything (UI) on (UI) phone. |
| Ind. A: | Right you never texted Franklin [FENNELL]. |
| Shahadey: | Never, no! |
| Ind. A: | (OV) About making fake invoices (UI). |
| Shahadey: | No! |
| Ind. A: | (OV) You never said nothing? |
| Shahadey: | I never said (UI) (OV) – |
| Ind. A: | You swear you never told him? |
| Shahadey: | You don't have to worry about me I'm smarter than both of you combined (UI). |
| Ind A: | I know you are but I just wanna make sure. |
| Shahadey: | You don't have to worry about me. They have nothing. |

9

**UNDER SEAL**

Ind A:      Well I, they don't have nuthin' now –
Shahadey:   Yeah.

Ind A:      Let em get him. I-I don't care but I want to do that other job (ph).
Shahadey:   You gotta hurry up (UI). You gotta geeb [kickback]. We gotta geeb (kickback). We gotta get back in the geeb [kickback].
Ind A:      (OV) We gotta get back in the geeb [kickback].

Ind A:      I didn't know if the FBI was following you now you jack ass.
Shahadey:   Oh yeah. They aren't following me believe me I'm not even on their radar. Ok now, so the geeb [kickback] to get back in good graces is gonna have to be double to triple the geeb [kickback] for you.

Shahadey:   Give me some of that geeb [kickback]. Let me see how much.
Ind A:      (UI)
Shahadey:   How much is it?
Ind A:      3 each.
Shahadey:   (UI) are you sure?
Ind A:      Positive. Three thousand each. Don't spend it all in one place.
Shahadey:   You don't have to worry about (UI).
Ind A:      Make sure you give Franklin [FENNELL](UI)
Shahadey:   Are you listening to me, I'll take care of him and he will call, I will call him.
Ind A:      Well tell him, ok, next week I'm gonna go finish that job, ok?
Shahadey:   Yeah.
Ind A:      Ok. And -
Shahadey:   You wanna ride out there now?
Ind A:      Where?
Shahadey:   Franklin's (UI) see his house (UI), fucking it's a mess (UI) . . .
Ind A:      (UI)
Shahadey:   (UI)
Ind A:      Um, I'm so glad this mess is over. Now (UI)
Shahadey:   Well, I need some more I can tell you that.

28.     Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent evidence, I believe that during this recorded conversation SHAHADEY continually referenced "geeb" as the coded word he uses for kickback payments. SHAHADEY and Individual A discussed how wise they were to use coded language in text and

10

**UNDER SEAL**

email messages. They also discussed SHAHADEY providing FENNELL'S portion of
the kickback payment to FENNELL.

29.     Following this meeting, agents observed SHAHADEY drive to
FENNELL'S home, and meet in FENNELL'S backyard.

30.     Following the meeting, Individual A told agents that he/she provided a
$6,000 kickback payment to SHAHADEY and Individual A returned $1,000 to the
agents.

31.     On July 18, 2016, Individual A contacted SHAHADEY on the telephone,
in a recorded conversation. Individual A advised he/she would complete the job at
the Hoosier Prairie VCSC location, and then would be ready to start another job on
the retention pond. (Note: Individual A had been paid for the Hoosier Prairie job in
the VCSC payment referenced above in paragraph 23. Accordingly, Individual A was
discussing finishing the job for which he/she had already been paid.) During this
conversation, SHAHADEY advised he had told FENNELL about the plan to move
forward with the retention pond and that FENNELL was happy about it.

32.     Based on my training and experience, my knowledge of the investigation
as a whole, and interviews of Individual A, who has been corroborated by independent
evidence, I believe that during this recorded conversation the discussion of the
retention pond referenced VCSC P.O. number 961774, for $39,835, received by
Business A to complete a retention pond project at South High School. According to
Individual A, the job had not been completed but FENNELL and SHAHADEY each

11

**UNDER SEAL**

expected to receive several thousands of dollars in kickbacks in connection with the

job, once it was paid by VCSC.

33.    On July 18, 2016, Individual A again spoke with SHAHADEY on a

recorded telephone call. An excerpt follows:

| | |
|---|---|
| Shahadey: | You know everybody's a little nervous about what happened the other day, you know, when you met with me. |
| Ind. A: | Yeah, what about it? |
| Shahadey: | Well, they're thinking something's up. I said absolutely not. Am I correct? |
| Ind. A: | You're correct. What would be up? |
| Shahadey: | Ok. |
| Ind. A: | What, what what would be up? |
| Shahadey: | Oh, somebody's working with somebody. |
| Ind. A: | Are you out of your mind? |
| Shahadey: | Well, they, you know what I mean. I told em, I think he knows better than that because he knows what would happen. You know what I mean. And he's not that way. But, so. I'm just letting you know. So. |
| Ind. A: | Alright. |
| Shahadey: | Just be careful what you say and do, you know what I mean. Cause he's uh real scared. |
| Ind. A: | Ok. |

34.    Based on my training and experience, my knowledge of the investigation

as a whole, and interviews of Individual A, who has been corroborated by independent

evidence, I believe that during this recorded conversation SHAHADEY was advising

Individual A that FENNELL was suspicious of Individual A after the July 15, 2016,

kickback payment to SHAHADEY and FENNELL. SHAHADEY assured FENNELL

that Individual A would not be cooperating with law enforcement.

35.    On July 25, 2016, Individual A spoke to SHAHADEY and SHAHADEY'S

wife, in a recorded telephone conversation. SHAHADEY was in Florida on vacation

at the time of the conversation. An excerpt follows:

**UNDER SEAL**

| | |
|---|---|
| Shahadey: | Everywhere we've been going, I've been paying cash for everything, you know. |
| Ind A: | Well that's smart. |
| Shahadey: | Well, it's geeb [kickback] cash.  You gotta geeb [kickback], |
| Ind A: | I hear ya. |
| Wife: | More... |
| Shahadey: | Yeah, (laughs)... |
| Ind A: | (laughs)... |
| Shahadey: | Yeah, make sure there's some there, you know, um... |
| Ind A: | Well. |
| Shahadey: | (UI) |
| Ind A: | I'm trying to get stuff worked out with our geeb [kickback], (UI) |
| Shahadey: | Oh, yeah. |
| Ind A: | Cause he wants me to give him a proposal some on some jobs so . . . |
| Shahadey: | Oh good. |
| Ind A: | But he hasn't said anything, he put me on hold on that big job, dummy. |
| Shahadey: | Oh he did. |
| Ind A: | Told me to hang on to that South job.  I don't know why.  But we had equipment and everything ready.  We still got it lined up.  I think he's probably going to let me do it this week but I don't know. |
| Shahadey: | Well, I'm sure.  That's good.  Alright (UI) . . . |

36.     Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent evidence, I believe that during this recorded conversation SHAHADEY told Individual A that he had spent cash received through kickbacks to pay for his vacation.  SHAHADEY inquired whether FENNELL had scheduled more work for Individual A so that he could receive additional kickback payments.  In response, Individual A advised that FENNELL had temporarily put the retention pond project on hold.

**UNDER SEAL**

## FENNELL HIRES BUSINESS A TO REMOVE STUMPS
## FROM VCSC PROPERTY AT INFLATED COST

37.    On July 20, 2016, Individual A contacted FENNELL in a recorded telephone conversation.  During the conversation, Individual A told FENNELL he/she was in the process of completing the work at Hoosier Prairie for which he/she had already been paid.  Individual A and FENNELL discussed the retention pond project and whether they could move forward with the work.  According to the recorded conversation, FENNELL told Individual A that there was other work (in addition to the retention pond) that Business A could perform for the VCSC.  During the recorded call, FENNELL asked Individual A whether Individual A had looked at the tree stumps on the VCSC property located at Ouabache Elementary School.  According to FENNELL, the tree stumps had to be removed before school started.

38.    On July 27, 2016, Individual A and FENNELL met, in a recorded meeting, at Ouabache Elementary School to discuss the removal of several tree stumps, the removal of a dead tree, and other trees which needed to be trimmed.  Individual A told FENNELL that the cost to remove the stumps would be $300 per stump.  FENNELL directed Individual A to draft a proposal for the removal of the stumps and to draft a separate proposal for the tree removal and trimming.  This meeting was observed by agents.

39.    On August 1, 2016, Individual A and FENNELL met, in a recorded meeting, at North High School.  This meeting was observed by agents.  At the direction of agents, Individual A provided FENNELL with estimates and invoices for the work to be completed at Ouabache Elementary School.  Included in the documents

14

**UNDER SEAL**

provided were the estimate/invoice for the removal of seven stumps for a total of $3,100 (hereinafter "the First Ouabache Job"). This amount reflected Individual A's price of $300 per stump as well as the expected inflated kickback amount of $1,000 which would be split between FENNELL and SHAHADEY. Individual A and FENNELL also discussed FENNELL's interview with the FBI on July 12, 2016. Following is an excerpt from the recording:

Fennell:     You have not-you have not done enough investigating if you think I get to make those decisions. That's the scary part about the whole thing [Individual A], I don't know that they know enough about what they're investigating to [laughing].

Ind A:       The scary part, well I-I'm glad we talked ([UI] you had me scared to death. I thought, Franklin you went to them. I thought you told them what we did. I was like flipping out. Cuz you were the other few days. Way you were acting towards me I was like, Oh my god (OV). I –I thought that's it all. He went and told em all the shit we've been pulling. I was like oh my god. He uh I was like I-I look at me Franklin I look the best I've looked a day in ten years (UI). Look at me. Okay, (OV) I've lost weight like nobody's business, I was scared to death. I knew you were gonna go tell'em something, I was like ahh.

Fennell:     You never have to worry about that [UI] Now if they recorded you right here, we're all going down [UI] [laughing] . . .

Ind A:       Franklin, you better hope they didn't record us right now (background sound) [UI]. Is that you?

40.    On August 1, 2016, Individual A met, in a recorded meeting, with SHAHADEY.

       The following is an excerpt:

Shahadey:    Ok, here's what we're going to do so's you know, ok, tomorrow (UI) and from here on out the geeb [kickback] is going to be 50/50.
Ind A:       What do you mean?
Shahadey:    50/50. Frank does not want in, so . . .
Ind A:       Um . .
Shahadey:    K, but I'm gonna save it back a few for him. No, I am. I got, I've got. I've got to have more, ok, I'm not like you. Ok.
Ind A:       Oh. You're. Listen, uh greedy.

**UNDER SEAL**

Shahadey:    Listen.  Listen.  I am not greedy.  I am not greedy.  But guess what?  I'll just show you.

41.    Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent evidence, I believe that during this recorded conversation SHAHADEY stated that FENNELL did not want his portion of the kickback payments.    However, SHAHADEY advised that he intended to put FENNELL's portion aside to provide to him later.  It is noted this meeting took place approximately 2.5 hours after the meeting with FENNELL, referenced in paragraph 39, during which FENNELL accepted inflated invoices for the first stump job.

42.    On August 9, 2016, Individual A spoke to FENNELL on a recorded telephone call.  FENNELL told Individual A that he (FENNELL) had put an account number on the invoices (provided to FENNELL on August 1, 2016, and referenced in paragraph 39) and had submitted the invoices to the VCSC Business Office. According to FENNELL, Individual A would receive the purchase orders authorizing the work for the First Ouabache Job in the next few days.

43.    On August 19, 2016, Individual A met with FENNELL, in a recorded meeting, at Sarah Scott Middle School.  FENNELL provided Individual A with P.O. number 963206, for the First Ouabache Job at a cost of $3,100 ($2,100 for the stump removal; $1,000 for the kickback payments).  Agents surveilled FENNELL to an area near Sarah Scott Middle School and observed Individual A depart Sarah Scott Middle

16

**UNDER SEAL**

School following the meeting. Immediately following the meeting, Individual A provided agents with the P.O. that FENNELL had given him.

44.    On August 19 and 20, 2016, Business A completed the First Ouabache Job.

45.    On August 23, 2016, Individual A met with SHAHADEY in a recorded meeting. SHAHADEY inquired whether there was anything "coming in." Individual A advised SHAHADEY that he would receive $500 from the First Ouabache Job. At that meeting, SHAHADEY told Individual A that FENNELL thought "someone's got to" him. SHAHADEY advised he told FENNELL that Individual A "may set you (FENNELL) up, but he knows what I would do." Individual A responded, "Yea you would kill me. I already know."

46.    Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent evidence, I believe that during this recorded conversation SHAHADEY was inquiring whether Individual A had any jobs with the VCSC which would result in a kickback payment to SHAHADEY. SHAHADEY also told Individual A that FENNELL was suspicious of Individual A but that SHAHADEY had assured FENNELL that Individual A would not cooperate with agents against SHAHADEY because Individual A knew that SHAHADEY would hurt Individual A if he did cooperate.

47.    On August 23, 2016, Individual A received the original P.O. number 963206 (the First Ouabache Job), at Business A's address, through the United States Postal Service (USPS).

**UNDER SEAL**

48.     On October 27, 2016, Business A received a VCSC check (number 154162) mailed via the USPS in the amount of $3,100 from the VCSC, in payment of P.O. 963206.  The envelope was postmarked October 25, 2016.

## FENNELL SEEKS INFLATED PROPOSALS FROM BUSINESS A FOR A SECOND JOB AT OUABACHE ELEMENTARY SCHOOL

49.     On September 2, 2016, Individual A and FENNELL met, in recorded meetings at Otter Creek and Rio Grande Schools to discuss additional tree work that FENNELL wanted Business A to complete for the VCSC.  The two also discussed the FBI's investigation and others who had been interviewed.  Meetings at both locations were observed by agents.  Following are excerpts:

| | |
|---|---|
| Ind. A: | Well that's good. Because I was scared to death (UI). . . |
| Fennell: | (UI) |
| Ind. A: | I thought me, you and uh Shahadey were packing our toothbrushes. |
| Fennell: | No, I don't think. No I can tell you right now, {IA}, I'm never gonna admit (UI) |
| Ind. A: | OK. |
| Fennell: | As long as you know you're not . . . |
| Ind. A: | I'm not admitting nothing. |
| | |
| Ind. A: | Then we don't have nothing to worry about, ok. So, I mean.  The only thing we got to worry about is "9" being so much greedy, wanting more, more, more. You know what I mean? That's the only thing we got to keep under control.  If we would have stuck to our plan like we uh said, 5 each, we would have been good.  But, you know, it got bigger. Five thousand. . . |
| Fennell: | (UI) |
| Ind A: | (OV) 2 thousand, but you know uh, like on these, if we just do 5 each on these, we'll be good, we'll be good. |
| Fennell: | Yeah, we'll be good. |
| Ind. A: | Alright. |
| Fennell: | I'm not worried about it. |

50.     Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent

**UNDER SEAL**

evidence, I believe that during this recorded conversation Individual A told FENNELL that if they had inflated invoices by only $1,000 ($500 each), instead of the much larger kickbacks that had occurred during their scheme, their illegal activities would have likely remained undetected by law enforcement. But instead, Individual A, FENNELL, and SHAHADEY had increased the inflated amounts by thousands of dollars over the life of the scheme in order to obtain larger kickbacks. Individual A told FENNELL that if they proceeded with smaller kickbacks, they would not be detected. Individual A referred to SHAHADEY as "9" in a reference to SHAHADEY'S call sign/unit number with the Sheriff's Department; 84-9.

51.    On September 13, 2016, Individual A and FENNELL met, in a recorded meeting, at Business A to discuss a second tree removal job at Ouabache Elementary School (hereinafter, the "Second Ouabache Job"). Agents observed FENNELL depart the meeting.

52.    An excerpt from this meeting follows, and includes FENNELL's instruction to inflate the price of the tree removal to reflect the kickback payments to FENNELL and SHAHADEY:

| | |
|---|---|
| Ind A: | Alright well I'm uh I'm fifty-two sixty. Six hundred per stump (UI). |
| Fennell: | Okay. (UI) |
| Ind A: | What do you want me to put, what do you want me to make the invoice? |
| Fennell: | You (UI) the big tree. |
| Ind A: | The big tree. This is—this is—this is just the big tree. That's that big tree there and this is this stump. One tree, one—one stump. Fifty-eight—fifty-eight sixty total for both. You want two—one invoice or two invoices? |
| Fennell: | Um two put that other. I already got the other one. |
| Ind A: | Which one? |
| Fennell: | The tree. For that invoice, I'm not, I mean proposal for the tree. For that dead one out front. |

19

**UNDER SEAL**

| | |
|---|---|
| Ind A: | Yeah but that's—that's a different. That's uh—that's fourteen—isn't that like fourteen hundred something. |
| Fennell: | Yeah yeah yeah. |
| Ind A: | So you got that invoice but this is for that big uh—the big tree. |
| Fennell: | [OV] For the one in the middle playground. |
| Ind A: | In the playground. That—so I'm sure you guys want to take this uh... |
| Fennell: | Stump yeah. That would be (UI)? Right? |
| Ind A: | Sixty-five even. |
| Fennell: | Yea. |
| Ind A: | For both or for...Sixty-five for this? |
| Fennell: | No for both that's good... |
| Ind A: | Sixty-five? |
| Fennell: | Put both down. |
| Ind A: | Sixty-eight. |
| Fennell: | Sixty. |
| Ind A: | Sixty-eight sixty? |
| Fennell: | Mmhm. |
| Ind A: | Five and five? |
| Fennell: | Mmhm. |

53.     Based on my training and experience, my knowledge of the investigation as a whole, and the hand-written invoice Individual A provided immediately following the meeting, on which both Individual A and FENNELL wrote their proposed numbers, I believe that during this recorded conversation Individual A told FENNELL that Business A's price for removing the second tree and the stump was $5,860. FENNELL directed Individual A to put a total price of $6,860 (inflated by $1,000) on two invoices so that both FENNELL and SHAHADEY could each receive a $500 kickback payment.

54.     On September 15, 2016, Individual A spoke to SHAHADEY on a recorded telephone conversation. An excerpt follows:

| | |
|---|---|
| Ind A: | You're working McDonald's tomorrow, Saturday? What you working next week? |
| Shahadey: | Yeah, yeah. |

**UNDER SEAL**

| | |
|---|---|
| Ind A: | Oh, same place? |
| Shahadey: | Same place. |
| Ind A: | Franklin told me he's working over there with you. |
| Shahadey: | Yeah, gotta get something. Can't get no geebing [kickback] done, you know what I mean? |
| Ind A: | Uh, I (UI) |
| Shahadey: | I hope you got something coming here soon. |
| Ind A: | I do. |
| Shahadey: | What? |
| Ind A: | (UI) |
| Shahadey: | Ok, good, alright |

55.     Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent evidence, I believe that during this recorded conversation SHAHADEY told Individual A that FENNELL was forced to work a night security job at McDonald's because FENNELL had been unable to collect kickback payments from Individual A. SHAHADEY had complained to Individual A on numerous occasions that the VCSC Business Office had been slow to process P.O.s and invoices for payment.

56.     On October 10, 2016, Individual A spoke to FENNELL on a recorded telephone conversation. During the call, FENNELL said that he had obtained the estimates/invoices for the Second Ouabache Job discussed in paragraphs 51-55 from Business A. FENNELL also told Individual A there was another large tree at Ouabache Elementary School which needed to be removed. FENNELL verbally authorized Individual A to remove the trees the following weekend even if Individual A had not yet received a P.O. from the VCSC Business Office.

57.     On October 13, 2016, Individual A and FENNELL met at Ouabache Elementary School to discuss removal of the other large tree and stump. Agents

21

**UNDER SEAL**

observed this meeting. FENNELL told Individual A that the other large tree had to be removed, and Individual A told FENNELL that it would cost $3,800. When Individual A asked FENNELL about the price he/she should put on the invoice, FENNELL responded $4,800 (reflecting the $1,000 inflated price and $500 per person kickback). When Individual A asked about the stump invoice, FENNELL directed him to use the same price as given on the Second Ouabache Job (see paragraphs 51-55).

58.    Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent evidence, I believe that during this recorded conversation FENNELL directed Individual A to inflate the invoice for the other tree removal by $1,000. FENNELL also directed Individual A to inflate the invoice for the removal of the stump to reflect the same price on the Second Ouabache Job (referenced in paragraphs 51-55). That invoice had been inflated by $500. Accordingly, the total price for the second tree and stump removal would be inflated by $1,500.[1]

59.    On October 14 through 17, 2016, Individual A and his/her employees completed the work of the remaining two large trees and their respective stumps at Ouabache Elementary School.

60.    On October 18, 2016, Individual A received, via facsimile, the following P.O.s for the Second Ouabache Job:  Individual A received P.O. number 964013,

---

[1]    According to the website TreeRemoval.com, the average cost of tree removal is $500-$1,000. The average cost to remove a stump is $60-$350-- depending on the size of the stump.

**UNDER SEAL**

which provided for the removal of a stump for $1,100 (inflated by $500 over Individual A's quote of $600 for the stump). Individual A also received VCSC P.O. number 964012, which provided for the removal of the large tree for $5,760 (inflated by $500 over Individual A's quote of $5,260). The total amount on the two P.O.s was $6,860. I have reviewed the P.O.'s and they reflect both the language and amounts listed on the estimates/invoices created by Individual A and obtained by FENNELL on October 10, 2016 (see paragraph 56). The amount was $1,000 more than Individual A had quoted to FENNELL, and thus, included the $500 kickback payment for FENNELL and SHAHADEY.

61. As set forth in paragraph 48, on October 27, 2016, Individual A received a check via the USPS in the amount of $3,100 from the VCSC (number 154162), in payment for the First Ouabache Job.

62. At the direction of agents, Individual A deposited the VCSC check (number 154162) on October 27, 2016. On October 27, 2016, Individual A met with SHAHADEY in a consensually recorded meeting at Harrison College. Prior to the meeting, agents met with Individual A and searched Individual A's person and vehicle. Any currency in Individual A's possession was removed. Agents provided Individual A with $1,000. During the meeting, which was recorded, Individual A paid SHAHADEY the $500 kickback payment arising from the First Ouabache Job, and the resulting $3,100 VCSC check. SHAHADEY and Individual discussed when Individual A was going to give SHAHADEY an advance on the anticipated kickback payment for the Second Ouabache Job. During the meeting, SHAHADEY placed a

23

**UNDER SEAL**

call to FENNELL, and while FENNELL was on the speaker phone, and recorded, FENNELL directed Individual A to give FENNELL's $500 kickback payment to SHAHADEY. SHAHADEY agreed to deliver FENNELL's $500 kickback payment to FENNELL. SHAHADEY further requested that Individual A should provide a $200 gift card to a local sushi restaurant.

63.     Following the meeting, agents gave Individual A $200 to purchase a gift card from Umi Grill Sushi Bar.

64.     On October 28, 2016, at the direction of agents, and during a recorded in-person meeting in a Rural King parking lot, Individual A gave FENNELL the $200 gift card.

## THREATS MADE BY SHAHADEY

65.     On October 4, 2016, Individual A met, in a recorded meeting, with SHAHADEY. During the meeting, SHAHADEY threatened to kill a VCSC employee for giving a journal, maintained by FENNELL, to VCSC Superintendent Danny Tanoos.

66.     Based on my training and experience, my knowledge of the investigation as a whole, and interviews of Individual A, who has been corroborated by independent evidence, I believe that during this recorded conversation SHAHADEY referenced FENNELL'S continued concerns that the VCSC Superintendent ("Danny") was going to fire FENNELL because FENNELL had information relevant to the pending federal investigation. According to SHAHADEY, if the Superintendent fired FENNELL, the three could not continue their kickback scheme. SHAHADEY threatened to harm

24

**UNDER SEAL**

the person who provided purported evidence of FENNELL'S cooperation to the

Superintendent. Following is an excerpt from that meeting:

| | |
|---|---|
| Shahadey: | He's bad. |
| Ind. A: | Mad at Danny? |
| Shahadey: | Bad. |
| Ind. A: | Why? |
| Shahadey: | You know, Frank [FENNELL], you know his attorney told him, anybody tries to talk to you about any of this just jot it down |
| Ind. A: | Right. |
| Shahadey: | (UI) |
| Ind. A: | Right. |
| Shahadey: | (UI) he did it, you know, just, you know, talking to my attorney, talked to this guy. Ernie Thompson? |
| Ind. A: | Uh huh. |
| Shahadey: | He found Frank's book at Sarah Scott, laid down, he went through it, read it and took it to Danny. |
| Ind. A: | Uh. |
| Shahadey: | So guess what? I want him killed, I think I'm about do it. |
| Ind. A: | You're out of your mind. |
| Shahadey: | Oh No, listen to me, he's crossed the line. Crossed the line. |
| Ind. A: | Uh. |
| Shahadey: | Danny won't talk to him, he has Mick call him up. That's what he does when he's getting people. |
| Ind A: | No wonder he's so crazy. |

## CONCLUSION

67.    The below timeline illustrates the kickback scheme and July through

October kickback payments referenced above:

### TIMELINE OF EVENTS

| January 2014 | Business A begins working for VCSC. |
|---|---|
| April 2014 | FENNELL directs Individual A to begin inflating invoices so that kickbacks would be made to FENNELL and SHAHADEY. |
| June 8, 2016 | Federal agents execute search warrants at VCSC locations. |
| June 15, 2016 | Business A received $33,700 check for work completed at Hoosier Prairie prior to June 8, 2016 search warrants. |
| July 15, 2016 | Individual A meets with Shahadey at agent's direction, and tenders $6,000 in kickback payments arising from |

25

**UNDER SEAL**

| | |
|---|---|
| | work completed at Hoosier Prairie, and agreement between Individual A, Fennell, and Shahadey to inflate the cost of the work and split the overage. |
| July 15, 2016 | Shahadey meets with Fennell after receiving kickbacks from Individual A. |
| July 20, 2016 | Fennell hires Business A to remove trees and stumps at Ouabache Elementary School. |
| July 27, 2016 | Fennell meets with Individual A at Ouabache Elementary School. |
| August 1, 2016 | Fennell directs Individual A to submit invoices for First Ouabache Job, and Shahadey directs Individual A to inflate the cost, and split the overage 50/50. |
| August 9, 2016 | Fennell submits the inflated proposals to VCSC. |
| August 19, 2016 | Fennell gives Individual A purchase orders for First Ouabache Job. |
| August 19-20, 2016 | Business A completes First Ouabache Job. |
| August 23, 2016 | VCSC mails original purchase order for First Ouabache Job. |
| September 13, 2016 | Fennell hires Business A to complete Second Ouabache Job, and directs Individual A to inflate invoice. |
| October 13, 2016 | Fennell hires Individual A to remove a second large tree, and directs Individual A to inflate the invoice. |
| October 14-15, 2016 | Business A completes the First and Second Ouabache Jobs. |
| October 18, 2016 | VCSC mails purchase orders for First and Second Ouabache Jobs to Business A through U.S. Mail. |
| October 27, 2016 | VCSC funds First Ouabache Jobs, and Individual A receives via USPS a VCSC check in the amount of $3,100 as payment. Individual A deposits the check at agent's direction, and pays SHAHADEY and FENNELL (through SHAHADEY) $500 each in kickback payments. |
| October 28, 2016 | Individual A pays FENNELL a $200 kickback payment in the form of a gift card, as instructed by SHAHADEY. |

68. Based on the above evidence, there is probable cause that FRANKLIN V. FENNELL and FRANK SHAHADEY have committed a violation of Title 18, United States Code § 666. By this affidavit and application, I request that the Court issue an arrest warrants for FRANKLIN V. FENNELL and FRANK SHAHADEY.

**UNDER SEAL**

## APPLICATION FOR SEALING ORDER

69.     Release of the information contained in this affidavit and related papers will likely hinder and impede this investigation by revealing the identities of persons interviewed by Agents conducting the investigation and by providing information which may lead to identification of informants who have assisted in the investigation. Public disclosure of information within this affidavit would have an adverse impact upon the on-going investigation and the ability to gather additional evidence. Furthermore, public filing may alert the arrestees named in this Affidavit allowing them the opportunity to flee or create a danger for the arresting officers. Accordingly, it is respectfully requested that this Complaint Affidavit, except for copies as are necessary for its implementation, be sealed until further Order of the Court so as to not jeopardize this investigation.


Joann Dowell
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this ⏐st day of November 2016.


The Honorable Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

27